J-S14014-15

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellee | : | |
| | : | |
| v. | : | |
| | : | |
| GEORGE SWISHER, | : | |
| | : | |
| Appellant | : | No. 687 EDA 2014 |

Appeal from the PCRA Order February 5, 2014,
Court of Common Pleas, Philadelphia County,
Criminal Division at No. CP-51-CR-0401801-1999

BEFORE:  DONOHUE, OLSON and MUSMANNO, JJ.

MEMORANDUM BY DONOHUE, J.:                    **FILED MARCH 02, 2015**

Appellant, George Swisher ("Swisher"), appeals from the order denying his petition for relief, filed pursuant to the Post Conviction Relief Act, 42 Pa.C.S.A. §§ 9541-46 ("PCRA"), for DNA testing.  For the reasons that follow, we affirm the order of the PCRA court.

In this Court's memorandum decision dated December 30, 2003, we set forth the following statement of the facts established at trial in support of Swisher's convictions for two counts of second-degree murder, 18 Pa.C.S.A. § 2502, two counts of robbery, 18 Pa.C.S.A. § 3701, and one count each of conspiracy, 18 Pa.C.S.A. § 903, and possession of an instrument of crime, 18 Pa.C.S.A. § 907:

> On the night of December 30, 1990, Swisher picked up his neighbor, Hector Alicea, from Alicea's house, and the pair went to pick up a third friend, Jose Pagan. (N.T., 11/29/00, at 104).  The trio then went

to pick up a black male at Frankford and Ontario Streets. (*Id.* at 105). Alicea did not know the black males' full name but he knew him as "Mod." "Mod" is a nickname for Jamod Rohn. (*Id.* at 106, 120). Alicea thought that the four were going to the 400 block of Dauphin Street to retrieve Pagan's gold chain. (*Id.* at 106-07). The men parked at Orkney and Dauphin Streets, around the corner from their destination of 429 W. Dauphin Street. (*Id.* at 108). The four walked up to the house, and Swisher stood next to the house in a vacant lot. (*Id.* at 108). Pagan knocked, and one of the victims, Luis Bermudez, came to the second-floor window. (*Id.* at 108). Some words were exchanged and Bermudez came downstairs and opened the door. (*Id.* at 108). Bermudez walked upstairs, followed by Pagan, Swisher, Mod, and Alicea. (*Id.* at 109).

When Alicea arrived at the second floor, he stood in the doorway and saw all of the others inside of the apartment, with Pagan and Bermudez speaking loudly in Spanish. Alicea testified that he did not know what they were saying because he does not speak Spanish. (*Id.* at 109). Alicea then heard a woman's voice call out "June," which is Pagan's street name. (*Id.* at 110). Alicea then walked further into the apartment and saw Pagan with a small, black gun in his hand. Pagan was waiving the gun in the air, and when Alicea walked further into the apartment, Pagan waived the gun toward Alicea and directed Alicea to watch the door. (*Id.* at 111). Alicea served as the "look-out" and guarded the door. Pagan, Swisher, Rohn, and the victims, Luis Bermudez and Ivelisse Gonzalez, remained in the front bedroom. (*Id.* at 111). Alicea looked back from his front door post, and saw Bermudez in a facedown position, being tied up by Swisher. (*Id.* at 112). Alicea resumed his look-out duties, then he turned around again and saw Rohn having sexual intercourse with Ivelisse Gonzalez. (*Id.* at 112-114). While Rohn was raping Ms. Gonzalez, Swisher fondled her breasts. (N.T., 11/30/00, at 14). Alicea turned back towards the front door, after which he

heard a gunshot in the front bedroom. (N.T., 11/29/00, at 115).

When he heard the gunshot, Alicea looked into the front bedroom again, and he saw Pagan turn toward Ivelisse Gonzalez with a gun in his hand and fire. (*Id.* at 115). Shocked, Alicea stood frozen as Swisher, Rohn and Pagan ran past him to exit the building. (*Id.* at 116). Alicea followed and fled the building. (*Id.* at 116). The four got into [Swisher's] vehicle and Swisher sped away. (*Id.* at 116). Swisher drove Alicea home, but before arriving there, Mr. Pagan gave him one $100 [bill] and told him not to say anything about the night's events or Pagan would kill Alicea or Alicea's family. (*Id.* at 116). Although first denying having any information about the shootings, on September 19, 1997, Alicea finally admitted to police that he has served as a look-out during the incident on December 20, 1990.

*Commonwealth v. George Swisher*, No. 2120 EDA 2002 (Pa. Super. December 30, 2003) (unpublished memorandum).

A jury convicted Swisher of the above-referenced crimes in November 2000, and in February 2001, the trial court sentenced him to a term of life in prison on the murder convictions and two and one half to five years of imprisonment on the possession of an instrument of crime and conspiracy convictions. This Court affirmed the judgment of sentence in December 2003 and our Supreme Court denied his petition for allocatur in May 2004. Swisher has filed two previous petitions for PCRA relief, which the PCRA court denied in 2005 and 2011, and these decisions were affirmed on appeal.

The present PCRA petition, Swisher's third, seeks relief in the form of DNA testing of certain items of physical evidence from the crime scene, including cigarette filters or butts, bed sheets, and the ligatures used to bind the victims. In his *pro se* PCRA petition, Swisher contends that "had [he] participated in the crimes alleged[,] his DNA would have [] saturated the crime scene according to the testimony presented at trial." PCRA Petition, 6/15/2012, at 5. As such, Swisher argues that the absence of his DNA on the crime scene items "would exclude him of such participation that may have been alleged." *Id.* at 5a. The PCRA court dismissed Swisher's present PCRA petition without an evidentiary hearing, and this appeal followed.

Post-conviction DNA testing falls under section 9543.1 of the PCRA, and thus "[o]ur standard of review permits us to consider only whether the PCRA court's determination is supported by the evidence of record and whether it is free from legal error." ***Commonwealth v. Brooks***, 875 A.2d 1141, 1144 (Pa. Super. 2005). Section 9543.1 of the PCRA, governing post-conviction DNA testing, provides in relevant part as follows:

**§ 9543.1. Postconviction DNA testing**

**(a) Motion.--**

(1) An individual convicted of a criminal offense in a court of this Commonwealth and serving a term of imprisonment or awaiting execution because of a sentence of death may apply by making a written motion to the sentencing court for the performance of forensic DNA testing on specific evidence that is

- 4 -

related to the investigation or prosecution that resulted in the judgment of conviction.

(2) The evidence may have been discovered either prior to or after the applicant's conviction. The evidence shall be available for testing as of the date of the motion. If the evidence was discovered prior to the applicant's conviction, the evidence shall not have been subject to the DNA testing requested because the technology for testing was not in existence at the time of the trial or the applicant's counsel did not seek testing at the time of the trial in a case where a verdict was rendered on or before January 1, 1995, or the applicant's counsel sought funds from the court to pay for the testing because his client was indigent and the court refused the request despite the client's indigency.

\* \* \*

**(c) Requirements.--**In any motion under subsection (a), under penalty of perjury, the applicant shall:

(1) (i) specify the evidence to be tested;

(ii) state that the applicant consents to provide samples of bodily fluid for use in the DNA testing; and

(iii) acknowledge that the applicant understands that, if the motion is granted, any data obtained from any DNA samples or test results may be entered into law enforcement databases, may be used in the investigation of other crimes and may be used as evidence against the applicant in other cases.

(2) (i) assert the applicant's actual innocence of the offense for which the applicant was convicted;

\* \* \*

(3) present a prima facie case demonstrating that the:

(i) identity of or the participation in the crime by the perpetrator was at issue in the proceedings that resulted in the applicant's conviction and sentencing; and

(ii) DNA testing of the specific evidence, assuming exculpatory results, would establish:

(A) the applicant's actual innocence of the offense for which the applicant was convicted;

\*     \*     \*

**(d) Order.--**

\*     \*     \*

(2) The court shall not order the testing requested in a motion under subsection (a) if, after review of the record of the applicant's trial, the court determines that there is no reasonable possibility that the testing would produce exculpatory evidence that:

(i) would establish the applicant's actual innocence of the offense for which the applicant was convicted;

42 Pa.C.S.A. § 9543.1

Sections 9543.1(c)(3) and (d)(2) require that a petitioner demonstrate that there is a "reasonable possibility" that "favorable results of the requested DNA testing 'would establish' the [petitioner's] actual innocence of the crime of conviction." **Brooks**, 875 A.2d at 1147 (quoting **Commonwealth v. Heilman**, 867 A.2d 542, 546–547 (Pa. Super. 2005), appeal denied, 583 Pa. 669, 876 A.2d 393 (2005). On prior occasions, this

Court has held that the definition of "actual innocence" to be applied in this context is that articulated by the United States Supreme Court in its opinion in **Schlup v. Delo**, 513 U.S. 298 (1995), namely, that the newly discovered evidence must make it "more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." **Id.** at 327; **see Commonwealth v. Conway**, 14 A.3d 101, 109 (Pa. Super. 2011). This standard requires a reviewing court "to make a probabilistic determination about what reasonable, properly instructed jurors would do," if presented with the new evidence. **Schlup**, 513 U.S. at 329.

Accordingly, the mandates in sections 9543.1(c)(3) and (d)(2) require the PCRA court to assess a petitioner's request for DNA testing in light of the trial record to see if there is a reasonable possibility that the testing could produce exculpatory evidence to establish Appellant's actual innocence. **Commonwealth v. Williams**, 35 A.3d 44, 49-50 (Pa. Super. 2012) (quoting **Commonwealth v. Smith**, 831 A.2d 1194, 1196 (Pa. Super. 2005), *appeal denie*d, 905 A.2d 500 (Pa. 2006)). In this case, the PCRA court made the required assessment, reviewing the evidence presented at trial, including the testimony of two of his co-conspirators (Rohn and Alicea) detailing Swisher's involvement and participation in the events leading to and following the two murders. Trial Court Opinion, 6/25/2014, at 4. Based upon its review, the PCRA court indicated that "it seems as though [Swisher] has mistakenly presumed that there was not an overwhelming amount of

evidence in the record to otherwise tie him to the crime," *Id.* The PCRA court concluded that Swisher "has made no averments which might demonstrate any possibility that favorable DNA testing results would establish his innocence." *Id.* at 5.

Based upon our own review of the certified record, we agree with the PCRA court that Swisher has not presented a prima facie case by demonstrating that the DNA testing of specific evidence, assuming exculpatory results, would establish his actual innocence. In *Heilman*, this Court rejected a petitioner's argument that the absence of his DNA at the scene of a crime could conclusively absolve him of culpability, stating that "[i]n DNA as in other areas, an absence of evidence is not evidence of absence." *Heilman*, 867 A.2d at 547. Whether or not this maxim holds true in all instances, it is certainly the case with respect to the cigarette filters/butts found at the crime scene – since the absence of Swisher's DNA on them would prove, at most, that he did not smoke at the crime scene. Similarly, with respect to the bed sheets, there is no direct testimony that Swisher ever came into contact with them, and thus the absence of his DNA would not prove his absence from the crime scene. Even if the testing revealed the bed sheets had on them the DNA of some unknown third party (i.e., other than the conspirators or the victims), such evidence would not be

exculpatory for Swisher, since it would not establish the presence of this other person at the time of the crimes.[1]

Finally, with respect to the ligatures used to tie up the victims, there was testimony at trial (from Alicea) that Swisher tied up Luis Bermudez, N.T., 11/29/2000, at 112, and thus the absence of Swisher's DNA on those ligatures could possibly provide some evidence that would contradict Alicea's testimony on this point. Even if Swisher could demonstrate that he did not tie up Bermudez, however, this would fall far short of establishing a prima facie case of his actual innocence – since there is considerable other evidence in the record to prove Swisher's participation in the conspiracy to rob and kill the victims. Two participants in the conspiracy (Alicea and Rohn) testified at trial that Swisher drove the four conspirators to and from the crime scene, that he was in the bedroom during the rape and murders, that he fondled the breasts of Ivelisse Gonzalez while Rohn raped her, and that he agreed to keep quiet about the entire episode (in exchange for $100).

In sum, the trial record in its entirety demonstrates that DNA testing could not result in any reasonable possibility of exculpatory evidence to prove Swisher's actual innocence.

Order affirmed.

---

[1] In his PCRA Petition, Swisher indicates that there was a stain on the bed sheets that did not match the DNA of any known samples. PCRA Petition, 6/15/2012, at 5.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/2/2015